IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| GREGG HADEN | § | |
| v. | § | CIVIL ACTION NO. 6:19cv566 |
| DIRECTOR, TDCJ-CID | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

The Petitioner Gregg Haden, a prisoner of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding through retained counsel, filed this petition for the writ of habeas corpus under 28 U.S.C. §2254 complaining of the legality of his conviction. The petition has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges.

**I. Background**

Haden was convicted of four counts of aggravated sexual assault of a child and four counts of indecency with a child, receiving four 75-year sentences and four 20-year sentences, all running consecutively. He took a direct appeal, and the Sixth Judicial District Court of Appeals affirmed the conviction on May 18, 2017. *Haden v. State*, slip op. no. 06-16-00141-CR, 2-17 Tex.App. LEXIS 4510, 2017 WL 2178897 (Tex.App.-Texarkana, May 18, 2017, pet. ref'd). After the Texas Court of Criminal Appeals denied Haden's petition for discretionary review, he filed a state habeas corpus petition on January 14, 2019. This petition was denied without written order on the findings of the trial court without a hearing on November 20, 2019. Haden has now sought federal habeas corpus relief.

1

The facts of the case, as recounted by the Sixth Judicial District Court of Appeals, were as follows:

Angie began dating Haden in February 2003, when Angie's son, John, was three years old. Angie and Haden married in 2007, and John seemed happy with their union. Angie stated that Haden was an active participant in John's life, often taking John hunting and fishing. According to Angie, from 2007 until 2011, the family seemed to be doing well; however, in 2011, Haden was arrested for the offense of online solicitation of a minor, causing things to "change" for the family. Angie explained that John's attitude and mood changed and that he no longer wanted to participate in family activities. Angie testified further that John was regularly angry or frustrated with Haden and that Haden would oftentimes discipline John by making him sit at the kitchen table and write Bible verses, something that John disliked doing.

Jeremy Johnson, a youth pastor at the family's church, testified that he had frequent interaction with John and his family. Johnson explained that he had a connection with John and that eventually John began speaking to him about personal matters. Johnson stated that John usually came into his office, dropped his books and bag, and asked if he could go outside and explore. On one occasion, however, John "came in and kind of had his head down a little bit," and then handed Johnson a letter. [FN3] After reading the letter, Johnson became concerned and contacted the senior pastor of the church, who told Johnson he needed to contact the Department of Family and Protective Services (the Department). Johnson did as the senior pastor advised him to do.

Cindy Dowler Black, an investigator with the Harrison County Sheriff's Department, was asked to speak with John after he had been interviewed at the Children's Advocacy Center (CAC). Black stated that John had some communication issues. "He—he was just—I don't know, just kind of a little nervous about the whole situation, I think." Black explained that John brought an electronic device to their meeting and that he told her that he had typed in the following information on it the night before the interview:

August 4th, 2007, [Haden] showed me pornographic videos, and he made—and made me touch him. Not long after that, when me and [Haden] and my cousin [William] were moving stuff to our new house, [Haden] said you would give me and [William] BBs for our gun if we did something. I got it—I got out of it, but [William] did not. I do not know what [William] had to do.

John informed Black that Haden had touched John's penis with his hand and his mouth and that Haden made John do the same thing to him. John told Black that these incidents occurred where Haden had lived and also at oil field locations and in a shop behind the residence where John and his mother had lived before Haden and his mother married and lived on Lefever Road. [FN4] John explained to Black that when they were at the oil fields, "[Haden] took [John]'s hand and put it on his penis and made his arm go up and down, but his hand and fingers didn't move; just his arm up and down" and that Haden put his mouth on John's penis. John told Black that

2

Haden would put his hand or mouth on John's penis while showing John video recordings on his phone and that he had done so between five and ten times.

Black also testified that John had informed a CAC interviewer that Haden kept Playboy and Penthouse magazines at John's grandparents' home. John explained that Haden would take the magazines out of the bathroom cabinet when they were at his grandparents' house and that Haden would show them to John and his cousin, William, and then touch John. [FN5] Black went to the grandparents' home and found the magazines in the exact location John had said they would be.

In addition, Black explained to the jury that victims of sexual assault can often react very differently. When asked how quickly a child reports abuse, Black stated, "Depends on the child. You could have a child that tells after the first assault; you can have a child that takes this for years and years and doesn't say anything because they're still afraid of their attacker."

Steven Bradley Stovall, Angie's brother, testified that after he heard the accusations against Haden regarding John, he asked his son, William, if Haden had ever been inappropriate with him. [FN6] Steven explained, "Before we could get it out he just—his body just dropped, a deer-in-the-headlight look. Just kind of a, 'Oh, my gosh, how do you know?' " "[I]t took less than a second for me to realize what the answer was to the question. So it was just kind of disbelief that it—that it had happened." William, prodded by his mother for a response, replied in the affirmative.

At trial, William related that Haden had begun to act inappropriately toward him in 2008, when he was ten years old. William recalled that on the first occasion, Haden told William that if they complied with his directions, Haden would thereafter take the boys [FN7] to a sporting goods store. Haden directed William to go into the bathroom with him and pulled his penis from his pants, asking William if he wanted to touch it, to which William replied, "[N]o, no way." At that point, Haden redressed and then took William and John to the sporting goods store.

About a year later, Haden approached William again, but on this occasion, Haden touched William's penis with his hand and his mouth. William said that Haden told him that if he told anyone of the incident, they "would both get in trouble, and that no one needed to know." William related that this kind of behavior was repeated by Haden "[t]welve to fifteen times." William also testified that Haden would often obtain a magazine or movie that William described as being some form of pornographic material "[a]nytime [Haden] thought he could show [William] without someone else seeing." William also explained that Haden had been sexually inappropriate with William and John at the same time and that William had observed Haden "touch[ ] [John's] penis with his mouth and his hand."

John testified that Haden would "harass" him constantly in efforts to get him to engage in sexual activity. John stated that he had touched Haden's penis with his mouth and his hand and that Haden had touched John's penis with his mouth and his hand and he did not like to think about or remember the incidents that had happened with Haden. John explained that the alleged abuse occurred between 2007 and 2011 and that he decided to tell someone in 2011, after reading a book that explained that Haden's behavior was abuse and that it was wrong. It was then that John wrote a letter and gave it to Johnson, his church youth pastor.

John indicated that he recalled having spoken to Black in Marshall (at the Harrison County Sheriff's Department) about Haden's actions and said that his memory of the events was probably better when he spoke with Black than it was at trial, acknowledging that he could remember some of the events when he spoke with Black that he could no longer recall.

FN3: The letter stated: "Sexual abuse means forcing a young person to take part in any kind of sexual activity. This may include kissing or touching genitals or breast. It may also include intercourse. Abuse might include asking a child to touch parts of his or her own body or showing children pornographic magazines or videos. In the summer of 2011 (June) my dad got arrested for sexting, which he started four months before. He always showed me videos on the computer that I didn't like."

FN4: Black said that each of the locations identified by John (except the Lefever Road property) are in Gregg County, Texas.

FN5: Black recorded her interview with John, which the defense offered into evidence at trial.

FN6: Stovall explained that William spent time with John and that the two were together "probably weekly."

FN7: William stated that John was outside sitting in the truck at the time of the incident.

Haden v. State, 2017 WL 2178897, at *1-3.

## II. The Petition for Habeas Corpus Relief

In his habeas petition and a brief in support, Haden asserts that: (1) hearsay testimony from an improper outcry witness was erroneously admitted; (2) evidence of extraneous acts was improperly admitted in the guilt-innocence phase; (3) his due process rights were violated by the presence of members of Bikers Against Child Abuse at his trial; (4) he received ineffective assistance of counsel at trial in a number of particulars; and (5) he received ineffective assistance of counsel on appeal. Haden also requested an evidentiary hearing. The Respondent has filed an answer arguing that Haden's claims lack merit. Haden did not file a reply to the answer; accordingly, the allegations of the answer shall be accepted as true except to the extent that the Court finds from the evidence that they are not true. 28 U.S.C. §2248.

## III. General Standards for Habeas Corpus Review

28 U.S.C. §2254(d) provides that in order to be granted a writ of habeas corpus in federal court, a petitioner must show that the state court's adjudication of his claim resulted in a decision

4

which was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). An "unreasonable" application of federal law is different from an "incorrect" application of federal law. *Renico v. Lett*, 559 U.S. 766, 773, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010). This means that a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly; rather, the decision must be "objectively unreasonable," a standard which creates a substantially higher threshold for obtaining relief than *de novo* review. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).

The "contrary to" clause of §2254(d)(1) applies when a state court fails to apply a legal rule announced by the Supreme Court or reaches a result opposite to a previous decision of the Supreme Court on materially indistinguishable facts. The "unreasonable application" clause of §2254(d)(1) applies when the state court correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case. *Dorsey v. Stephens*, 720 F.3d 309, 314 (5th Cir. 2013), (citations omitted). The AEDPA thus imposes a "highly deferential standard for evaluating state court rulings" and "demands that state court decisions be given the benefit of the doubt." *Renico*, 559 U.S. at 773.

In this regard, the Fifth Circuit has explained that "federal habeas review under AEDPA is therefore highly deferential. The question is not whether we, in our independent judgment, believe that the state court reached the wrong result. Rather, we ask only whether the state court's judgment was so obviously incorrect as to be an objectively unreasonable resolution of the claim." *Cardenas v. Stephens*, 820 F.3d 197, 201-02 (5th Cir. 2016). State courts' findings of fact are entitled to a presumption of correctness and a petitioner can only overcome this presumption through clear and convincing evidence. *Reed v. Quarterman*, 504 F.3d 465, 49 (5th Cir. 2007).

## IV. Discussion of the Claims

### A. The Outcry Witness

Haden contends that the State failed to give the notice of outcry witness as required by statute and that counsel was surprised by the State's presentation of Black as the outcry witness. He asserts that his defense was prejudiced by Black's testimony and that Black was the only witness to provide direct testimony that the acts alleged were committed in Gregg County. However, he contends that Black was not the first adult to whom the complainant made outcry.

Article 38.072 of the Texas Code of Criminal Procedure creates an exception to the hearsay rule in the prosecution of certain sexual offenses committed against children for the admission of a child's first outcry of sexual abuse to an adult. *Gibson v. State*, 595 S.W.3d 321, 326 (Tex.App.-Austin 2020, no pet.). This exception applies only to out-of-court statements which (1) describe the alleged offense, (2) were made by the child, and (3) were made by the first person over the age of 18 to whom the child made a statement about the offense. *Bays v. State*, 396 S.W.3d 580, 581 n.1 (Tex.Crim.App. 2013). To be a proper outcry statement, the child's statement to the outcry witness must describe the alleged offense in some discernible manner and be more than merely a general allusion to sexual abuse. *Sims v. State*, 12 S.W.3d 499, 500 (Tex.App.-Dallas 1999, pet. ref'd), *citing Garcia v. State*, 792 S.W.2d 88, 91 (Tex.Crim.App. 1990).

After voir dire was completed and the jurors were excused, the trial court had a hearing on the outcry issue. (Docket no. 9-7, p. 143). At this hearing, Haden's trial counsel William Hughey argued that youth minister Jeremy Johnson was the first individual to whom outcry was made, and prosecutor Stacy Brownlee responded that Johnson was the first person to receive information, but he was not the one who received the full outcry about the allegations that happened here in this county. After Hughey again maintained that Johnson was the proper outcry witness, Brownlee stated that Cindy Dowler Black was the State's outcry witness, noting that "the child gave a detailed statement to Investigator Black in regard to these offenses and the location of the specific offenses that we're talking about today, or in this trial." (Docket no. 9-7, p. 144). Hughey responded that

Black was an officer so there had to be another individual to get to her, and Johnson was that other individual. Brownlee acknowledged that Johnson was the first person who had an inkling that something was going on, but there was no detailed outcry made to him. The Court ruled that the outcry witness is the first person to whom the child describes the offense in some discernible or detailed manner, and Officer Black would be allowed to testify as to that. (Docket no. 9-7, p. 145).

In a hearing at trial outside the presence of the jury, Hughey argued that based on Black's report, the proper outcry witness was CPS investigator Kelli Faussett. (Docket no. 9-8. p. 6). Brownlee stated that Faussett did a CAC [Childrens' Advocacy Center] interview, but John's ability to give details was quite limited. She stated that "in a very unusual circumstance, Ms. Dowler [Black] felt it necessary to go back and get further details from this child. Her interview elicited more details about the offenses in this county, and that's why we named her the outcry." She said she had discussed this with Hughey, but he denied this, saying he had never had a conversation with counsel about Black being the outcry witness and that Black in her own statement said that Faussett was the outcry witness.

The trial court stated that only generalities were being offered and the previous argument was that Black was the first person to whom the child made discernible outcry to describe the events in Gregg County. The trial court added that just because a child tells a person that he has been abused, that does not make the person the sole outcry witness, and asked Hughey if he had something to show that the child made a discernible outcry of these events prior to Black. Hughey responded that this was not his reading of the statute, and asked if there could be a "bifurcated outcry" since the first outcry did not deal with Gregg County. The Court replied that was what the case law seems to say and it went to the offense itself. Hughey asked "Your Honor, let me look at this right quick," followed by a discussion off the record. Back on the record, Hughey asked the Court to note his exception. (Docket no. 9-8, p. 9).

On appeal, Haden argued that Black was not a proper outcry witness under Article 38.072 because she was the third person over the age of 18 with whom John had discussed the allegations.

The Court of Appeals determined that while Haden contended that Black could not be an outcry witness because she was not the first person to whom John described the abuse, he failed to point to a specific conversation between John and any other witness wherein John explained Haden's behavior in some discernible manner which amounted to something more than a general allusion to sexual abuse. Thus, the appellate court concluded that the trial court did not abuse its discretion in finding that Black was the first person to whom Haden made a detailed outcry, or by allowing her to testify as the outcry witness.

In the state habeas court's findings of fact and conclusions of law, the court noted that the issue of the allegedly improper outcry witness was raised and rejected on direct appeal. Haden could have raised the issue of allegedly deficient notice on direct appeal but did not. The court also found that Haden was neither surprised nor prejudiced by Black's testimony, and there was no evidence that a reasonable likelihood existed that the outcome of the trial would have been different but for the alleged misconduct. (Docket no. 9-29, p. 201).

As noted above, the question of who is a proper outcry witness is a matter of state law, governed by Article 38.07 of the Texas Code of Criminal Procedure. As a general rule, violations of state law do not set out valid grounds for federal habeas corpus relief because federal habeas corpus is available only for the vindication of rights existing under federal law, not rights existing solely under the rules of state procedure. *Manning v. Warden, Louisiana State Penitentiary*, 786 F.2d 710, 711 (5th Cir.1986); *Charles v. Thaler*, 629 F.3d 494, 500 (5th Cir. 2011). Where there has been a violation of state procedure, the proper inquiry is to determine whether there has been a constitutional infraction of the defendant's due process rights which would render the trial as a whole fundamentally unfair. *Manning*, 786 F.2d at 711; *see also Bronstein v. Wainwright*, 646 F.2d 1048, 1050 (5th Cir.1981) (a state's interpretation of its own laws or rules is no basis for federal habeas corpus relief since no constitutional question is involved). To the extent Haden complains that the trial court did not properly apply state law, his contention is without merit. Although he

8

claims he was "surprised" by the designation of Black as the outcry witness, the state habeas court found that Haden was neither surprised nor prejudiced by Black's testimony.

Furthermore, the state appellate and habeas courts found that the trial court acted properly in designating Black as the outcry witness. Haden has failed to show by clear and convincing evidence that this conclusion was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. His first ground for relief is without merit.

B. Extraneous Acts

Haden contends that at trial, the State presented evidence that he had previously been arrested for online solicitation of a minor. He had never been tried on the charge, which had been pending for five years at the time of trial. Nonetheless, he argues that this evidence "played center stage" in his trial, even though any probative value the evidence may have had was substantially outweighed by unfair prejudice.

At a pre-trial hearing on defense motions, Hughey noted that a motion to quash had been filed in the pending charge of online solicitation because a portion of the online solicitation statute had been declared unconstitutional in *Ex Parte Lo*, 424 S.W.3d 10, 17 (Tex.Crim.App. 2013). (Docket no. 9-6, p. 54). Referring to the present case, Hughey complained that he was "left to do battle with a statute that in a number of provisions has been declared unconstitutional in various parts." (Docket no. 9-6, pp. 54-55). The State responded that it was pretty clear which part of the statute was unconstitutional and that the portion under which Haden was charged, §33.021(c), had a different element than the portion which was declared unconstitutional, §33.021(b). In addition, the State argued that the evidence of extraneous offenses could come under article 38.37 or Rule 404. The trial court observed that the evidence could still qualify as a bad act under 404(b), but that proper notice still had to be given of what the State wanted to go into and at what time. (Docket no. 9-6, p. 59).

9

Immediately prior to trial, the court held another hearing on the outcry witness and extraneous offense issues (docket no. 9-7, p. 143). Hughey argued that youth minister Jeremy Johnson is the proper outcry witness, but Brownlee asserted that Johnson was the first person who had an inkling of what was happening, but there was no detailed outcry made to him. The court ruled that Officer Black would be allowed to testify as the outcry witness.

Brownlee next argued that William's testimony should be admissible under Article 38.37 of the Texas Code of Criminal Procedure,[1] since William was alleged to have been a victim in the same manner as John, the victim in the indictment. Hughey stated that a motion in limine had been filed concerning the solicitation of a minor case. The court ruled that the testimony by Officer Brownlee would be admissible under Article 38.37 and that a ruling on evidence on the other offense, against William, would have to wait for another hearing. (Docket no. 9-7, p. 148).

This other hearing was conducted on June 21, 2016, before the jury was brought into court. William was brought into court and testified as to his encounters with Haden, describing how Haden would undress him and place his hand or mouth on William's penis. (Docket no. 9-8, pp. 19-25). After the hearing, the trial court ruled that the evidence would support a finding by the jury that Haden committed the offense beyond a reasonable doubt, and that the evidence was admissible under Article 38.37 because it has bearing as to relevant matters including the character of the defendant and the acts performed in conformity with the character of the defendant. The trial court also stated that "the danger was not outweighed by unfair prejudice or confusing any of the issues or misleading the jury or needlessly presenting cumulative evidence." (Docket no. 9-8. p. 33).

---

[1] Article 38.37(b) of the Texas Code of Criminal Procedure provides in relevant part that notwithstanding Rules of Evidence 404 and 405, evidence that the defendant has committed a separate offense including sexual offenses or assaultive offenses against a child under 17 years of age may be admitted in a trial for sexual or assaultive offenses against a child under 17 years of age for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant.

At trial, former Longview police officer Kevin Brownlee[2] testified that in June of 2011, he posted a profile on Craigslist as part of a cyber-crime operation. The profile purported to be that of a 14 year old boy named "Ryan." Using the search word "twink," cyber-slang for a "young, effeminate boy," Brownlee found a personal advertisement posted by another individual who said he was "looking for young d*** and that he was looking to engage in sexual relations with a "twink" who must be white and under 25 years of age. Brownlee stated that he responded to this post as "Ryan." saying he had seen the ad looking for sex and "I duno how young is too young," but he was 14 years old and lived in Longview.

The next day, Brownlee stated that he received a response from Haden's email address, asking if he was white and what he looked like. Brownlee sent Haden a phone number from a cell phone and received a message a few minutes later saying "Hi, the guy from Craigslist." Photos were exchanged and Brownlee send address information as to where they should meet.

After more text messages with clearly sexual content were exchanged, Brownlee stated that Haden sent a text message saying he would be at the designated location in ten minutes. Haden then sent a message saying to meet at the Exxon station "so I know you ant [sic] no cop."

Brownlee stated that he continued texting with Haden to give detectives time to arrive. When the detectives reached the designated location, they saw several vehicles arriving and leaving, but a vehicle of the type registered to Haden remained in the parking lot. However, Brownlee stated that Haden became suspicious and left. Brownlee and another officer followed Haden and a police vehicle pulled him over. He was arrested for the offense of online solicitation of a minor and taken to the police department.

Brownlee said that an inventory search of Haden's car turned up a cell phone, and Haden signed a consent to search it. A subpoena was issued on Yahoo to get information about Haden's email account, and this information revealed that Haden had posted several personal advertisements

---

[2]Detective Kevin Brownlee testified that he was prosecutor Stacy Brownlee's husband.

seeking a young white drug and disease free male who would be willing to engage in sexual activity with him. (Docket no. 9-9, pp. 108-157).

On direct appeal, Haden argued that the evidence of extraneous bad acts was inadmissible because these alleged acts set out a violation of Texas Penal Code §33.021, criminalizing online solicitation of a minor, and a portion of that statute was held unconstitutional in *Ex Parte Lo*, 424 S.W.3d at 17. However, the Court of Appeals rejected this claim, determining that the specific portion of the statute with which Haden was charged, §33.021(c), had not been declared unconstitutional, although another portion, §33.021(b), had been.

Haden also raised the issue in a motion for new trial (docket no. 9-13, p. 7). The trial court denied the motion, finding that under Tex. Code Crim. Pro. art. 38.37, the evidence was relevant and admissible, and the jury was instructed that it had to believe the incidents beyond a reasonable doubt before the jury could use them.

In his state habeas petition, Haden argued that his right to due process and a fair trial were violated through the introduction of extraneous evidence. He noted that the longest testimony of any trial witness was that of the officer, Brownlee, who had arrested Haden for online solicitation.

However, Haden argued that extraneous offenses admitted under Article 38.37 must still survive a balancing test under Tex. R. Evid. 403, and such evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice. He contended that evidence showing he had attempted to contact younger men for sexual encounters through Craigslist did not serve to make more or less probable the fact that he sexually assaulted his minor stepson. Haden further stated that Texas courts of appeals have observed that the inherently inflammatory and prejudicial nature of extraneous-offense evidence of sexual offenses against children tends to suggest a verdict on an improper basis. In his case, he points to the substantial amount of evidence put on concerning the extraneous offense and argues that any probative value this evidence had was substantially outweighed by a danger of unfair prejudice. The State argued in response that Haden's habeas claim should be rejected because it had been raised and rejected on direct appeal.

Alternatively, even had appellate counsel challenged the trial court's Rule 403 analysis, the State contended that Haden could not prove by a reasonable probability that the challenge would have overcome an abuse of discretion standard on appeal. The state habeas court found that the probative value of the extraneous evidence outweighed the risk of unfair prejudice and that there was no evidence that a reasonable likelihood exists that the outcome of the trial would have been different but for the alleged misconduct.

In his federal habeas petition and brief in support, Haden contends that the common law has long deemed it unfair to argue that because a person has committed a crime in the past, he is more likely to commit a similar, more recent crime. Nonetheless, Haden notes that Texas permits introduction of separate offenses in trials of children under 17 years of age for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant. While Texas courts of appeals have held that Article 38.37 does not violate due process, Haden states that neither the Texas Court of Criminal Appeals or the U.S. Supreme Court have addressed the issue.

Even if the admission of the extraneous evidence did not violate due process, Haden argues that the trial court erred in determining that the prejudicial nature of the evidence outweighed its probative value. He argues that the inherently inflammatory and prejudicial nature of extraneous-offense evidence of sexual offenses against children tends to suggest a verdict on an improper basis and that the evidence in his case had a "marked tendency to confuse or distract the jury from the main issues." Haden observes that the extraneous complainant testified before the complainant in the charged case and tended to confuse the jury on the issue of venue because the extraneous act clearly occurred in Gregg County while there was conflicting evidence regarding whether the charged offense occurred in Gregg County.

Furthermore, Haden asserts that the extraneous-act evidence comprised an inordinate amount of the State's case. He avers that the admission of these extraneous acts as propensity evidence violated his right to a fair trial and maintains that the state court's rejection of this claim was

13

contrary to or involved an unreasonable application of Supreme Court precedent and was based on an unreasonable determination of the facts.

The federal courts do not sit to review the mere admissibility of evidence under state law. *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998). However, a state trial court's evidentiary rulings will mandate habeas relief when errors are so extreme that they constitute a denial of fundamental fairness. *Id.*; *see also Hafdahl v. Johnson*, 251 F.3d 528, 536 (5th Cir. 2001). Article 38.37 renders evidence of extraneous offenses more often admissible in cases involving sexual assaults of children, notwithstanding the normal rules of evidence, and the admission of such evidence does not violate due process if the State makes a strong showing that the defendant committed the offense and the extraneous offense is rationally connected with the offense charged. *Bonner v. Stephens*, civil action no. 3:13cv4649, 2015 U.S. Dist. LEXIS 177612, 2015 WL 10687489 (N.D.Tex., May 29, 2015), *Report adopted at* 2016 U.S. Dist. LEXIS 51398, 2016 WL 1556025 (N.D.Tex., April 18, 2016), *aff'd through denial of certificate of appealability* 2017 U.S. App. LEXIS 16971, 2017 WL 3725927 (5th Cir., July 7, 2017), *cert. denied* 138 S.Ct. 1556 (2018), *citing Kessler v. Dretke*, 137 F.App'x 710, 2005 U.S. App. LEXIS 12767, 2005 WL 1515483 (5th Cir. 2005) *and Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007).

Haden has not shown that the admission of the extraneous acts in this case violated fundamental fairness. The evidence concerning the solicitation of a minor charge involved Haden seeking out a minor male and offering to perform essentially the same sexual acts upon him which Haden was charged with committing against the victim in this case. (Docket no. 9-9, p. 121, docket no. 9-9, p. 69). Similarly, William testified that Haden performed essentially the same acts on him as he had upon the victim in this case. (Docket no. 9-9, pp. 30-31). In *Bradshaw v. State*, 466 S.W.3d 875, 879 (Tex.App.-Texarkana 2015, pet. ref'd), the defendant was charged with continuous sexual abuse of S.S., a girl under the age of 14. The State offered evidence of extraneous acts of sexual misconduct by the defendant against girls identified as B.P., A.G., and K.M. B.P. had sought to bring charges of aggravated sexual assault, but the grand jury no-billed these charges.

Nonetheless, the appellate court held that the trial court did not abuse its discretion in admitting the evidence of the extraneous evidence.

Similarly, in *Robisheaux v. State*, 483 S.W.3d 205, 218 (Tex.App.-Austin 2016, pet. ref'd), the defendant was charged with sexually assaulting A.B., the 13 year old daughter of his then girlfriend C.Y. The trial court admitted evidence that twelve years earlier, the defendant had a sexual relationship with L.E., who was then a 13 year old girl. On appeal, the court affirmed the ruling of admissibility, noting the similarities between the offenses and the fact that Rule 403 exclusion should be used "sparingly" in sexual molestation cases which must be resolved solely on the testimony of the complainant and the defendant. *See also Gaytan v. State*, 331 S.W.3d 218, 227-28 (Tex.App.-August 2011, pet. ref'd).

While the extraneous-offense evidence offered against Haden was undoubtedly prejudicial, he has not shown that the prejudicial nature of this evidence outweighed its probative value, nor that the state courts' decision to admit the evidence amounted to an unreasonable determination of the law or the facts. Haden's second ground for relief is without merit.

C. Improper Communication with a Juror

Third, Haden complains of improper communication between a juror and a witness for the State, Detective Brownlee. He says that upon returning from a break, the prosecutor stated as follows:

> Your Honor, I just wanted to bring to the court's attention, during the lunch break, Mr. Brownlee rode down in the elevator with some of the jurors. And one of the jurors asked him where they could find out about information for their children on the internet, and he told them to talk to LPD [Longview Police Department]. So I wanted to bring that to the court's attention and let them know.

(Docket no. 9-9, p. 150).

When asked for a response, defense counsel said "the cow's out of the barn, so I can't put it back in, okay." The court then advised Brownlee that when he is a witness, he should just tell jurors that he cannot talk to them.

15

Haden argues Texas law provides that no person may converse with a juror about the case on trial except in the presence and by permission of the court, and a new trial is required when a juror has spoken with anyone about the case. He contends that injury is presumed and the State failed to rebut this presumption.

The Supreme Court has stated that any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about a matter pending before the jury is presumptively prejudicial. *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). The courts distinguish between internal and external influences, with internal influences such as claims that a juror could not sufficiently understand English or had a severe hearing impairment, with external influences such as where jurors read information not admitted into evidence such as newspaper articles or hears prejudicial statements from others. *See Tanner v. United States*, 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). Internal influences do not provide a basis for relief, but external influences may be used to impeach a jury's verdict. *Id.*

The Fifth Circuit has explained as follows:

> Normally, under *Remmer*, if prejudice is likely from the jury's consultation of an external influence, the court may place the burden of rebutting that presumption on the state. *See Remmer*, 347 U.S. at 229, 74 S.Ct. 450; *United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir.1998) (stating that "only when the court determines that prejudice is likely should the government be required to prove its absence"); *see also United States v. Olano*, 507 U.S. 725, 739, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (stating that the ultimate inquiry is whether "the intrusion affect[ed] the jury's deliberations and thereby its verdict").

> However, on habeas review, we do not use the normal harmless error analysis. *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Pyles v. Johnson*, 136 F.3d 986, 994 (5th Cir.1998). Instead, habeas petitioners are not entitled to relief based on a constitutional error unless the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Id.* (*citing Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 2328, 168 L.Ed.2d 16 (2007) (holding that a federal court must assess the prejudicial impact of a constitutional error in a state court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht*).

*Oliver v. Quarterman*, 541 F.3d 329, 341 (5th Cir. 2008). In that case, several jurors brought Bibles into the jury room and consulted them, including a passage describing a crime very similar to that

with which the defendant was charged and commanding the death penalty. The Fifth Circuit determined that while the Bible was an improper external influence, the petitioner failed to offer clear and convincing evidence to rebut the state court's factual finding that the use of the Bible did not prejudice the jury's decision.

In *Moody v. Johnson*, 139 F.3d 477, 483 (5th Cir. 1998), there was conversation between a juror and the bailiff regarding a possible change in the jury charge and whether the jurors would be taken to dinner if they did not arrive at a verdict by 7 p.m. The defense moved for a mistrial, and the trial court took the matter under advisement.  The motion for mistrial and a later motion for new trial were ultimately denied after a hearing, with the trial court concluding that the conversation did not impact the jury's deliberations. The Court of Criminal Appeals stated that "we are unable to discern any injury to the accused" and determined that the State had adequately rebutted the presumption of harm.

On federal habeas review, the district court determined that no constitutional error occurred. The Fifth Circuit held that there was "more than adequate support in the record" for the factual conclusions reached by the state courts and affirmed the holding of the district court.

In the present case, the state habeas court found that the communication complained of did not pertain to any substantive matters on trial, but consisted merely of a juror asking Brownlee for general information about keeping children safe on the internet, to which Brownlee replied that the juror should contact the local police department.  The state court concluded that this communication was not a violation of Article 36.22 of the Texas Code of Criminal Procedure or Rule 21.3(f) of the Texas Rules of Appellate Procedure, the communication happened before jury deliberations and did not specifically concern the facts of the trial, and a new trial is not warranted because there is no evidence that a reasonable likelihood exists that the outcome of the trial would have been different but for the alleged misconduct.

As in *Oliver*, Haden has failed to offer clear and convincing evidence to rebut the state court finding that the conversation did not prejudice the jury's decision. The record supports the state

habeas court's determination that the conversation consisted only of a general request for information, which was answered with a suggestion to contact the local police department. Even given that the conversation was improper, Haden has failed to show constitutional harm. His claim on this point is without merit.

D. Bikers Against Child Abuse

Haden asserts that an organization called Bikers Against Child Abuse (BACA) maintained a "constant, intimidating presence" at his trial. Kristy Haden, Gregg Haden's sister-in-law, gave an affidavit stating that when the Stovalls came into the courthouse, they were escorted by numerous members of BACA, who formed a human wall shielding the Stovalls from contact with anyone. Their insignias were worn in the courthouse and hallways, although they had to remove them upon entering the courtroom. She termed it "a ridiculous show of force" given that no threats had been made against the Stovalls since the allegations were filed. (Docket no. 9-29, p. 90). Charla Pennington, who said she had known the Haden family for over 15 years, said in her affidavit that she was especially irritated at the courthouse by a group of bikers wearing jackets and acting like they had to physically protect Angie Haden; she said that the biker group "was there for a show to influence the judge or jury to believe they were necessary security or protectors of Angie Haden. It was a big, phony show."

Larry Pennington, who said he had known Haden for over 20 years, stated in his affidavit that the bikers "made a big show out of escorting Angie Haden everywhere she went, like between the courtroom and the restroom or the elevator. They would surround her, in front, behind, and on each side, like someone was going to attack or confront her. It was just a big show to influence the court and jurors." (Docket no. 9-29, p. 97). Similar statements were made by Lois Templin and Gary Haden in their affidavits. Haden agues that the presence of the bikers had an "inherently prejudicial external influence on the jury," pointing to a Florida case in which a conviction was reversed based upon the intimidating presence of BACA at trial. *Long v. State*, 151 So.3rd 498 (Fla. 1st. DCA 2014).

18

The state habeas court found that the bikers were required to remove their jackets before entering the courtroom, there was no evidence that any juror saw anyone wearing the jackets inside or outside the courtroom, and there was no evidence that the attendees' conduct or expression interfered with the jury's verdict. No objection was made to the attendance of BACA at trial, and the court concluded that Haden failed to prove by a preponderance of the evidence that the presence of the individuals interfered with the jury's verdict.

In *Long*, the bikers were observed sitting in a hallway with the jury on the morning trial was scheduled to commence. There was also evidence that there were eleven or twelve bikers in the courtroom and that the people who sat closest to the jury were members of BACA, although the trial court believed that some of the trial observers were members of the alleged victim's family. In the present case, by contrast, the state habeas court found there was no evidence that any juror saw anyone wearing the jackets inside or outside the courtroom, nor that the attendees' conduct or expression interfered with the jury's verdict.

In *United States v. Gallardo*, 970 F.3d 1042, 1047 (8th Cir. 2020), a direct appeal of a federal criminal conviction, the defendant contended that he should have been granted a mistrial because the presence of a group of bikers wearing vests saying "Bikers Against Child Abuse." On the first day of trial, there were members of the public in the courthouse wearing the biker vests; some were "guarding the doors of the courtroom," accompanying the victim to the public restroom, and visible in other public spaces of the building. The court consulted with the parties and asked the jurors if any of them had seen anyone "wearing regalia bearing a signature or message that they belonged to a certain group," but when no juror answered affirmatively, the case proceeded." The Eighth Circuit determined that there was no plain error and affirmed the conviction.

In *O'Brien v. Stephens*, civil action no. 4:12cv691, 2015 U.S. Dist. LEXIS 96644, 2015 WL 4508924 (S.D.Tex., July 24, 2015), *aff'd by denial of certificate of appealability*, slip op. no. 15-20458 (5th Cir., June 13, 2016), the petitioner complained that counsel was ineffective for failing to object to the presence of members of BACA. The state habeas court found that the BACA

members did not interact with the jury or disrupt courtroom proceedings and that the presence of BACA members did not have an impact on the jury's verdict, and thus there was no showing that had counsel acted differently, the result of the proceeding would probably have been different.

The federal district court determined that the petitioner failed to show that had counsel objected to the presence of the BACA members, the objection would have been granted and the bikers excluded from the courtroom.  The court observed that "this failure is particularly significant in light of the state trial court's finding that the members had no impact on the jury's verdict."

Even assuming that the presence of the bikers was an external influence, Haden has failed to offer clear and convincing evidence to rebut the state court's factual finding that the presence of the bikers did not influence the jury's verdict. *Oliver*, 541 F.3d at 341. The affidavits he presents shows that BACA members were present in the courthouse, a fact not in dispute, but as in *O'Brien*, this alone is not sufficient, particularly in light of the state court's findings.  His claim on this point is without merit.

### E. Ineffective Assistance of Counsel

In order to prevail on a claim of ineffective assistance of counsel, a state prisoner seeking federal habeas corpus relief must show that his attorney's performance was deficient and that the deficiency prejudiced him to the point that he was denied a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  This means that the habeas petitioner must establish both that (1) counsel's performance was deficient in that it fell below an objective standard of reasonable competence and (2) the deficient performance so prejudiced the defense that the outcome of the trial was unreliable and there is a reasonable probability that, but for counsel's performance, the result of the trial would have been different. Unless a petitioner makes both showings, he is not entitled to relief. *Del Toro v. Quarterman*, 498 F.3d 486, 490 (5th Cir. 2007). The burden of proving ineffective assistance of counsel is on the petitioner.  *Hayes v. Maggio*, 699 F.2d 198, 201 (5th Cir. 1983).

A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. This requires a substantial, not merely a conceivable, likelihood of a different result. *Cullen v. Pinholster*, 563 U.S. 170, 189, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).

Counsel has wide latitude in making tactical decisions, including formulating a strategy which was reasonable at the time. *Strickland*, 466 U.S. at 689; *Harrington v. Richter*, 562 U.S. 86, 107, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). This means, for example, that it is reasonable trial strategy for counsel to try to cast "pervasive suspicion of doubt [rather] than to try to prove a certainty that exonerates." *Id*. at 109.

The Fifth Circuit has explained that a conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness. *Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011).

In reviewing counsel's performance through the lens of an ineffective assistance claim, the Supreme Court has explained as follows:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana, supra*, 350 U.S. [91, 101, 76 S.Ct. 158, 100 L.Ed.83 (1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. *See* Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983).

*Strickland*, 466 U.S. at 689–90.

In the context of analyzing claims of ineffective assistance of counsel, the Supreme Court has explained the standards created by *Strickland* and 28 U.S.C. §2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. *Harrington v. Richter*, 562 U.S. at 105.

Application of this doubly deferential review is different from asking whether defense counsel's performance fell below the *Strickland* standard. The question is not whether the federal court believes that the state court's determination under *Strickland* was incorrect, but whether that determination was unreasonable - a substantially higher threshold. *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 173 L.Ed.3d 251 (2009). This is because the state court must be granted a deference and latitude which is not in operation when the case involves review under the *Strickland* standard itself. Consequently, the Fifth Circuit has stated that even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable; rather, in order to obtain habeas corpus relief, the petitioner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement. *Druery v. Thaler*, 647 F.3d 535, 539 (5th Cir. 2011).

### 1. Failure to Pursue Impeachment Evidence

Haden states that during cross-examination of Jeremy Johnson, counsel discovered that Johnson had communicated with the prosecutor through text messages prior to his testimony. Even though Johnson estimated that he and the prosecutor had exchanged some 15 to 20 messages, Haden complains that counsel failed to follow up on this avenue of discovery.

According to Haden, counsel failed to seek production of the messages under *Brady v. Maryland*, 373 U.S. 83, 87-88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or even request that the trial court inspect the messages *in camera* for potential *Brady* material. Although the State argued in the state habeas corpus proceeding that Haden failed to prove ineffective assistance because he did not show the existence of favorable evidence which was material to guilt or punishment, Haden asserts

22

that this begs the question - he cannot prove the existence of favorable evidence *because* counsel failed to seek its production at trial. Haden also says that contrary to the state habeas court's findings, counsel's affidavit sheds no light on the issue; instead, it simply says that he has no recollection of the impeachment evidence which he assumes was included in the file turned over to writ counsel, and that he is comfortable that his cross-examination of Johnson was done in a "direct effective manner."

At trial, Hughey asked Johnson if he had ever spoken to Hughey before, to which Johnson said no. Johnson then stated that he met Brownlee, the prosecutor, for the first time that morning, but that he had spoken to her by text messaging with maybe 15 or 20 messages. (Docket no. 9-8, p. 59). The state habeas court found that Hughey's affidavit was credible, and as Haden says, this affidavit simply states that he has no recollection of the impeachment evidence as to Jeremy Johnson, he believes it was included in the file turned over to writ counsel, and he is comfortable that he cross-examined Johnson in a direct and effective manner. (Docket no. 9-29, p. 198).

When a habeas petitioner alleges a failure to his counsel to investigate, he must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998). In other words, a petitioner cannot show prejudice with respect to a claim that counsel failed to investigate without adducing what the investigation would have shown. *Brown v. Dretke*, 419 F.3d 365, 375 (5th Cir. 2005).

This is because the petitioner must show that but for counsel's alleged dereliction, the result of the proceeding would probably have been different. *See Diaz v. Quarterman*, 239 F.App'x 886 (5th Cir. 2007) (noting that "a petitioner cannot show prejudice with respect to a claim that counsel failed to investigate and present mitigating evidence without adducing what the investigation would have shown," citing *Strickland*, 466 U.S. at 696. Although Haden argues that the Respondent is "begging the question" by noting that Haden did not identify any exculpatory evidence which would have been revealed, in fact a showing that counsel would have uncovered the existence of favorable evidence is an integral part of Haden's claim. Otherwise, *Strickland*'s requirement of prejudice

could be met by a speculative showing that favorable evidence might have been found or that but for counsel's actions, the result of the proceeding might have been different. Because Haden has offered nothing to suggest that but for counsel's actions in this regard, the result of the proceeding would probably have been different, his claim of ineffective assistance of counsel on this point is without merit.

### 2. Failure to Impeach Angie Haden

Haden asserts that counsel was deficient by failing to impeach Angie Haden with evidence that she did not initially believe John's claims of sexual abuse. Haden states that Gary and Kristy Haden accompanied Angie to meet with Jeremy Johnson the day after John first told Johnson about the sexual abuse. During this conversation, Angie persistently expressed disbelief in the allegations. The next day, Haden says that Angie told Gary and Kristy that John had said he needed to talk to William to get their stories straight. However, Haden complains that the jury never heard this because counsel did not use it.

Haden says that in the state habeas proceedings, the State speculated that this could have been "trial strategy," but trial counsel did not say that in his affidavit, simply stating that he had not reviewed the record and was in a position to state that he had missed this factor. In any event, Haden asserts that there is no reasonable trial strategy under which counsel could have ignored this evidence.

However, Haden offers nothing to suggest that but for counsel's failure to elicit this testimony, the result of the proceeding would probably have been different. This testimony would have shown only that Haden's wife initially did not believe that her husband had committed a very serious crime against her child. This is not necessarily an unusual reaction, nor is it evidence which would likely have led to an acquittal. *See, e.g.*, *Moorefield v. Dretke*, civil action no. 3:03cv2966, 2005 U.S. Dist. LEXIS 22201, 2005 WL 2445469 ((N.D.Tex., September 30, 2005), *Report adopted at* 2005 U.S. Dist. LEXIS 23844 (N.D.Tex., October 18, 2005), *appeal dismissed through denial of certificate of appealability* July 20, 2007) (petitioner's wife testified that she initially did not believe

her daughter but later began to believe her story); *Sharp v. Kelly*, civil action no. 1:08cv79, 2010 U.S. Dist. LEXIS 59822, 2010 WL 2539647 (N.D.Miss., May 28, 2010), *Report adopted at* 10`0 U.S. Dist. LEIS 59818, 2010 WL 2539610 (N.D.Miss., June 16, 2010) (child's mother initially did not believe the child's report but became supportive of her daughter after a medical exam). Because Haden has not shown that but for counsel's failure to elicit this testimony, the result of the proceeding would probably have been different, his claim on this point is without merit.

### 3. Failure to Obtain Psychiatric Records

Haden states that according to the record, John had been treated by a pediatric psychiatrist in Tyler named Dr. Ray Scardina for several years prior to his outcry. He says that Angie Haden testified John had been treated for attention-deficit disorder and, more recently, for anxiety; however, she told Black shortly after the outcry that she thought John might have bipolar disorder.

Haden states that counsel designated Dr. Scardina as a testifying expert and applied for a subpoena to obtain Dr. Scardina's records, but backed off before the subpoena issued. At a hearing before trial, counsel expressed concern that he would not receive the records, and the trial court stated that a hearing would be conducted if necessary to facilitate production of the records. However, he says that the file provided to habeas counsel from Hughey did not contain any records from Dr. Scardina. In April of 2019, Haden states that he sought issuance of a subpoena to obtain these records, but the trial court never ruled on the motion. He says that the state courts' rejection of this claim without the records was an unreasonable application of the Supreme Court's decision in *Strickland* and was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

John's psychiatric history was discussed extensively by Angie Haden at trial. She testified that a week after she and Haden returned from their honeymoon in 2007, John told her that he did not want to live any more and that he was going to try to cut his wrist. At that point, she stated that she made an appointment with Dr. Scardina, and that John saw the doctor a few times a year. (Docket no. 9-8, p. 97).

Angie Haden stated that John had been on medication for attention deficit disorder from time he was around four years old. She said that John had mentioned not wanting to live "a couple of times" since 2007, but has never told her why. He began seeing a second therapist in 2009, but Angie Haden testified that she did not recall the name of this therapist because "Gregg made a point to take him most appointments." She said that John stopped seeing this therapist because "Gregg came home and decided that he no longer needed her." (Docket no. 9-8, p. 101).

Angie Haden further testified that the next time she took John to a therapist was 2012, after the incident forming the basis of the prosecution. She said that he has seen three or four therapists since then. After Haden left, Angie Haden testified that "since then, he is a completely different child. He is very respectful, very kind, happy. He's off any of his medicines, except for the ADD and anxiety medicine. A completely different child." (Docket no. 9-8, p. 103).

On cross-examination, Angie Haden said that when John first said that he wanted to kill himself, he understood that she was married and was not deserting him. She said that John first started seeing a psychiatrist for attention deficit disorder, and then in 2007, he began having other emotional issues, including outbursts of anger and disciplinary issues. These outbursts began after Angie and Haden were married. (Docket no. 9-8, pp. 106, 110).

At trial, John testified that on the day Haden married Angie, in August of 2007, he and Haden were at Haden's house getting ready for the wedding. They were sitting on the couch when Haden pulled his penis out of his pants and told John to look at it. (Docket no. 9-9, p. 62).

As the Respondent argues, Haden has failed to overcome the presumption that the failure to obtain John's psychiatric records was sound trial strategy. Aside from the potential detrimental appearance of going after a child witness, Angie Haden's testimony made clear that focusing on John's psychiatric history was replete with pitfalls for the defense. According to her, John first expressed suicidal thoughts shortly after Haden exposed his penis to him on the day that Haden married John's mother and thereby became a fixture in John's life. Prior to Haden coming into his life, John displayed only attention deficit disorder, but afterwards, John had outbursts of anger and

disciplinary problems. Once Haden left, Angie said that John became "a completely different child," kind and respectful. Haden also cut off John's visits to a therapist in 2009.

The Fifth Circuit has held that a tactical decision not to pursue and present potentially mitigating evidence on the ground that it is double-edged in nature is objectively reasonable. *Kitchens v. Johnson*, 190 F.3d 698, 703-04 (5th Cir. 1999); *see also Jones v. Davis*, civil action no. 4:18cv334, 2019 U.S. Dist. LEXIS 132017, 2019 WL 3716440 (N.D.Tex., August 6, 2009) (claim that counsel was ineffective for failing to present evidence of petitioner's history of mental instability lacked merit because counsel concluded that these records would do more harm than good and so not admitting them was reasonable trial strategy).

In addition, Haden has offered nothing to suggest that but for the failure to obtain John's psychiatric records, the result of the proceeding would likely have been different. He does not point to any exculpatory evidence he believes these records contained, much less show that such exculpatory evidence would likely outweigh the damaging evidence to which Angie Haden alluded. Haden's claim of ineffective assistance of counsel on this point is without merit.

4. Failure to Object to Hearsay Testimony / Lack of Notice

Haden asserts that counsel rendered ineffective assistance with regard to the outcry issue. He states that counsel apparently assumed that Jeremy Johnson was the outcry witness and thus did not insist on notice and the other procedural requirements of Tex. Code Crim. Pro. Art. 38.072, and as a result, Haden contends that counsel was "clearly caught off guard" when the State announced Black as the outcry witness. He says that counsel failed to object to Black's hearsay testimony based on the State's failure to provide pretrial notice, and that counsel's affidavit stated that he had no recollection on whether he did or did not object to this "surprise aspect of the trial." Haden asserts that the state habeas court erred by relying on the rejection of this claim on direct appeal, when it was counsel's deficient performance which caused the claim to not be properly presented on appeal.

According to Haden, had counsel objected to the notice deficiency at trial, this would have compelled exclusion of Black's testimony. Because the State is the proponent of the outcry evidence, Haden says that the State must satisfy each predicate for admission, including notice at least 14 days before the proceedings begin. Here, however, Haden maintains that the State gave no pretrial notice at all regarding the identity of the outcry witness. Instead, he states that counsel had apparently assumed that Johnson would be the outcry witness, and specifically denied that the State had ever communicated with him, prior to the eve of trial, that Black would be the outcry witness. Nonetheless, Haden contends that counsel failed to object to Black's testimony on this basis, stating that had counsel done so, this testimony would have been excluded as inadmissible hearsay.

While counsel did object to Black's testimony, Haden claims that the issue was not presented effectively. Rather than argue that Black's offense report and videotaped interviews of John shows that John had told Kelli Faussett about the same incident which he later did to Black, counsel simply disagreed with the trial court's correct interpretation that the outcry witness is offense-specific. Haden says that counsel simply made a general objection, and as a result, the appellate court was constrained by trial counsel's deficient development of the issue.

After jury selection, the record shows that the trial court held a hearing on the outcry witness issue. Brownlee noted that the court had "carried it until today;" this appears to indicate that the issue had been raised at an earlier time, although it is not clear when it was carried from. (Docket no. 9-7, p. 142).

At this hearing, Hughey stated that he believed Johnson was the outcry witness, and Brownlee replied that Johnson was not the one who received the full outcry about the allegations which happened in Gregg County. Instead, Brownlee stated that Black would be the outcry witness, since the child gave a detailed statement to Black in regard to the offenses and their location. Hughey again stated that Johnson was the initial individual in the process, and Brownlee said that there was no detailed outcry given to Johnson. The trial court stated that the outcry witness is the

first person over the age of 18 to whom the child describes the offense in some discernible or detailed manner, and so Black would be allowed to testify as to that. (Docket no. 9-7, pp. 144-45).

Before the jury was brought in, Hughey stated that he wanted to reopen the issue of the outcry because he had a copy of Black's report, which clearly stated that Kelli Faussett was the outcry witness. Brownlee acknowledged that Faussett did a CAC interview, but stated that John's ability to give details was quite limited.  In a "very unusual circumstance," Brownlee said that Black felt it necessary to go back and get further details from John. This interview elicited more details about the offense in Gregg County, which is why the State named her as the outcry witness. Brownlee added that she could try to get Faussett available if the court believed that she was the outcry witness.  She said that she had discussed this with Hughey, but Hughey responded that he had never had a conversation with counsel about Black being the outcry witness, and that the only conversation he had about an outcry was "initially dealing with the individual who was the youth minister and everything." (Docket no. 9-8, pp. 6-7).

The record shows that during Black's testimony, Hughey objected to her testimony as hearsay. Brownlee responded that Black was the outcry witness, and the court stated that she was the outcry witness and so would be allowed to testify as to what the child said to her. (Docket no. 9-8, p. 210).

In his state habeas petition, Haden argued that the State failed to give notice of the outcry witness, resulting in surprise, and his defense was prejudiced by Black's testimony because Black was the only witness to provide direct evidence that the acts alleged by the State were committed in Gregg County. Without her testimony, Haden asserted that the State could not prove venue. In addition, Haden stated that Black was not the first adult to whom the complaining witness made a statement about the alleged offense and thus was not the proper outcry witness.

Although Haden raised a hearsay objection to Black's testimony about what John told her, he offered into evidence a video recording of Black's interview with John.  (Docket no. 9-8, p. 218). The Sixth Court of Appeals observed that "this recording contained evidence that was very similar

in content to Black's in-court testimony." *Haden v. State*, 2017 WL 2178897 at *5. The Texas Court of Criminal Appeals has held that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged. *Leday v. State*, 983 S.W.2d 713, 717 (Tex.Crim.App. 1998). Based upon this principle, Texas courts have held that errors in the admission of outcry testimony can be rendered harmless when the same evidence is admitted without objection from other witnesses, including the complainant. *See Rosales v. State*, 548 S.W.3d 796, 808-09 (Tex.app.-Houston [14th Dist.] 2018, pet. ref'd) (any error in the admission of outcry testimony was harmless where the same or similar evidence was offered through the testimony of a physician and the child victim); *Zarco v. State*, 210 S.W.3d 816, 833 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (no harm where State did not comply with the notice requirement of Article 38.072, but the victim detailed the same testimony which the outcry witness gave concerning the abuse).

In the present case, Haden himself admitted into evidence the recording of Black's interview with John, which the Court of Appeals said was "very similar" to Black's in-court testimony. (Docket no. 9-8, p. 218). Likewise, John himself testified in detail about the sexual abuse, including locations where the abuse took place. (Docket no. 9-9, pp. 61-82).

Thus, even assuming that Haden could have excluded Black from testifying by objecting to lack of notice and that the failure to object to the lack of notice under Article 38.07 amounted to ineffective assistance, Haden has not shown that but for the failure to object, the result of the proceeding would probably have been different. He argues that Black could have been excluded from testifying, but essentially the same evidence presented by Black in her testimony was placed before the jury through the video and through John's testimony. Furthermore, the State indicated that if Black was not the proper outcry witness, then they could call Kelli Faussett. (Docket no. 9-8, p. 7). While Faussett did not testify at trial, the evidence showed that she interviewed John, who told her about the sexual abuse and pornography. (Docket no. 9-8, p. 207; Docket no. 9-9, p. 102;

Docket no. 9-29, pp. 73-75). In the absence of any showing that but for counsel's actions, the result of the proceeding would probably have been different, Haden's claim on this point is without merit.

### 5. Unauthorized Communication Between a Juror and a Witness

This claim relates to the incident recounted above where Detective Brownlee talked to some of the jurors in the elevator. Haden contends that counsel "should have insisted on questioning the juror and determining whether Haden was injured by the unauthorized communication." He says that the conversation between Detective Brownlee and the jury raised a "rebuttable presumption of injury to Haden," which the State failed to rebut. Haden cites *Ocon v. State*, 284 S.W.3d 880, 884 (Tex.Crim.App. 2009), in which defense counsel overheard a juror making negative comments about the trial and the defendant in a phone call in the restroom, with another juror being in the restroom as well. Defense counsel moved for a mistrial, which was denied, and the defendant was ultimately convicted. The intermediate appellate court concluded that the trial court had abused its discretion by failing to grant the mistrial, but the Court of Criminal Appeals reversed this determination, stating that Tex. Code Crim. App. Art. 36.22 prohibits conversing with a juror about a case on trial, but a violation of this article does not automatically warrant a mistrial. Reporting the conversation to the judge raised a rebuttable presumption of injury, but the State rebutted this presumption by submitting that there was no way to verify defense counsel's account of the conversation and by reminding the judge that the jurors had been instructed not to talk about the case. The Court of Criminal Appeals observed that questioning jurors about allegations of misconduct may be helpful in determining the necessity for a mistrial but is not required. Mistrials are an extreme remedy and defense counsel appeared to have been satisfied with the curative instructions given by the trial court. Furthermore, the Court of Criminal Appeals stated that there was no evidence that the juror in question *received* any information as a result of the phone conversation; the purpose of Article 36.22 is to prevent outsiders from saying anything which might influence a juror. Thus, the focus is on whether the juror was biased as a result of the improper conversation, not whether the juror biased an outsider.

Article 36.22 specifies that "no person shall be permitted to converse with a juror about the case on trial except in the present and by the permission of the court." The conversation at issue here, in which jurors asked Detective Brownlee where they could find out about information for their children on the internet and he told them to contact the Longview Police Department, did not relate to the case on trial, and so Article 36.22 did not apply. *See Iness v. State*, 606 S.W.2d 306, 315 (Tex.Crim.App. 1980); *Thomas v. State*, 336 S.W.3d 703, 716 (Tex.App.-Houston [1st Dist.] 2010, pet. ref'd). Even if Article 36.22 did apply, Haden has failed to show that had counsel objected and demanded a hearing regarding this incident, the result of the proceeding would probably have been different. This claim is without merit.

6. Failing to Object to the Presence of Bikers Against Child Abuse

Haden asserts that counsel provided ineffective assistance by failing to object to the presence of Bikers Against Child Abuse at his trial. He points to the affidavits referenced above and contends that the bikers "clearly sought to send an implied message to the jury that the complainant and his family needed protection from Haden that not even the court was equipped to provide and that Haden should be found guilty, thus undermining the presumption of Haden's innocence."

As noted above, the state habeas court found in *O'Brien v. Stephens*, 2015 WL 4508924, that the presence of Bikers Against Child Abuse did not have an impact on the jury's verdict and the group did not interact with the jury or disrupt courtroom proceedings. The federal habeas court determined that the petitioner failed to show that had counsel objected, the objection would have been granted and the bikers excluded from the courtroom. The court noted that this failure was particularly significant in light of the state court's finding that the members had no impact on the jury's verdict.

Similarly, in the present case, the state habeas court found as a fact that the bikers were required to remove their jackets before entering the courtroom, there was no evidence that any juror saw anyone wearing the jackets in or outside of the courtroom, and there was no evidence that the attendees' conduct or expression interfered with the jury's verdict. Haden has not overcome these

findings with clear and convincing evidence and they are therefore presumed correct. Based upon the state court's findings, Haden, like O'Brien, has not shown that had counsel objected to the presence of the bikers, the objection would have been sustained and the bikers excluded from the courtroom. This claim is without merit.

### 7. Failure to Prepare Defense Witnesses

Haden says that several witnesses testified that they felt ill-prepared to testify at trial due to counsel's "inadequate or non-existent preparation." Kristy Haden said in her affidavit that "at the time of Gregg's trial, I never received any counseling from Gregg's trial attorney, William Hughey, to prepare for my testimony before the jury. I was not told what questions Mr. Hughey would ask me on direct examination or what questions I could expect the prosecutor to ask me on cross-examination. I felt completely unprepared for my testimony. I believe that if I had been properly prepared, I could have provided much more effective testimony." (Docket no. 9-29. p. 90).

Larry Pennington said in his affidavit that he thought he would be asked about how Angie Haden's family took possession of almost all of Haden's property, even before Haden was arrested. He also thought he would be asked about how Haden tried to impress upon John the need for him to not be disrespectful to his mother (Angie), about how Haden disciplined John and about Haden's good work ethic, how Haden provided for his family, and how Haden would come home from work and have to do household chores because Angie "would lay around all day and not do the things normally expected of a wife and mother." He also stated that he thought he would be asked about "the fine qualities of the entire Haden family." Pennington said that no attorney or investigator for Haden ever prepared him for court.

At trial, Kristy Haden testified that on March 8, 2012, Angie Haden called her to come to Jeremy Johnson's church. She said that Johnson, her husband Gary Haden, Angie Haden, and Bailey Haden, who was the three-year-old daughter of Gregg and Angie Haden, were present. At this meeting, Jeremy presented the letter which he had received from John detailing the sexual abuse. She stated that they discussed the allegations for about an hour to an hour and a half. After

she left, Kristy said that she went to Gregg and Angie Haden's house, where Gregg and Bailey were home. When Gregg Haden was told of the allegations against him, Kristy said that he was "very puzzled" and surprised that these allegations had been made against him. She added that Angie Haden was upset and in disbelief.

On cross-examination, Kristy Haden was asked if Child Protective Services came to the house while she was there, and she replied that they had already been there. No other questions were posed to her on cross-examination.

Larry Pennington testified at the punishment phase that he had known Haden for 19 years. He stated that Haden had helped him in the past, including one time when Pennington did not have place to move his mobile home and Haden gave him a place to go, at the end of Haden's property in Ore City. He said that he was asking the jury to be as lenient as possible in sentencing. On cross-examination, Pennington stated that Haden had helped him and he, Pennington, "did not see that he's guilty of this charge." (Docket no. 9-11, p. 22).

In *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir., 2007), the petitioner contended that trial counsel did not adequately prepare for the sentencing phase of his case because they failed to interview and prepare the witnesses who testified. The Fifth Circuit stated that "even assuming counsel failed to fully prepare these witnesses, Coble only argues that these witnesses would have been 'more effective' if they had been better prepared, which does not come close to suggesting that 'but for counsel's errors, the result of the proceeding would have been different.'" Likewise, Haden suggests only that his witnesses felt ill-prepared and believed they could have presented more effective testimony. This contention also does not come close to suggesting that but for counsel's errors, the result of the proceeding would probably have been different. Haden's claim on this point is without merit.

### 8. Cumulative Error

Haden asserts that "the cumulative effect of all trial counsel's errors - his failure to object to clearly objectionable, prejudicial evidence, his deficient handling of the outcry issue, his failure

to object to the intimidating presence of Bikers Against Child Abuse, his failure to obtain significant impeachment evidence, and other acts and omissions - undermined any hope of a fair trial and warrants reversal of Haden's convictions and sentences."

The cumulative error doctrine provides that an aggregation of non-reversible errors can yield a denial of the constitutional right to a fair trial, which calls for reversal. *Bonds v. Lumpkin*, slip op. no. 19-11318, 2022 U.S. App. LEXIS 370, 2022 WL 59894 (5th Cir., January 6, 2022), *citing United States v. Delgado*, 672 F.3d 320, 343-44 (5th Cir. 2012) (*en banc*). The doctrine applies only in the unusual case in which synergistic or repetitive error prejudices the defendant. *Id.*

In applying the doctrine, the court must determine whether the errors so fatally infected the trial that they violated the trial's fundamental fairness. *United States v. Ebron*, 683 F.3d 105, 130 (5th Cir. 2012). Meritless claims or claims which are not prejudicial may not be cumulated, regardless of the total number raised. *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996); *see also Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero.")

Whether viewed together or separately, the alleged errors identified by Haden do not rise to federal constitutional dimensions, nor does a review of the record reveal any violation of fundamental fairness. As such, Haden has presented nothing to cumulate, and his claim of cumulative error is without merit. *Ebron*, 683 F.3d at 130; *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993).

9. Ineffective Assistance of Counsel on Appeal

Haden contends that he received ineffective assistance of counsel on appeal, arguing that appellate counsel's failure to challenge the admission of evidence of two extraneous acts constituted deficient performance resulting in prejudice to his appeal. Specifically, Haden states that appellate counsel challenged the admission of evidence of Haden's arrest for online solicitation of a minor, but only on the basis that portions of the online solicitation statute had been held unconstitutional. He complains that appellate counsel failed to argue that admission of the extraneous-acts evidence

violated due process because any probative value was substantially outweighed by the danger of unfair prejudice under Tex. R. Evid. 403.

Haden states that over his objection, evidence was offered that he had been arrested for online solicitation of a minor, even though he was never tried for the charge. Nonetheless, he says that the evidence "played center stage" at his trial. In addition, there was evidence that Haden had sexually abused William. Haden argues that the inherent probative force of the extraneous-act evidence, particularly the arrest for online solicitation, was minimal as it related to the charged offense; he contends that evidence showing he sought to contact younger men through Craigslist for sexual encounters "did not strongly serve to make more or less probable the fact that he sexually assaulted his minor stepson." Haden maintains that the admission of these prior extraneous acts as propensity evidence during the guilt-innocence phase of his trial violated his right to a fair trial, and appellate counsel rendered deficient performance by failing to raise this issue on direct appeal. He contends that there is at least a reasonable likelihood that the outcome of his appeal would have been different had this issue been urged.

The Fifth Circuit has held that to prevail on a claim of ineffective assistance of counsel on appeal, the petitioner must make a showing that had counsel performed differently, there would have been revealed issues and arguments of merit on the appeal. *Smith v. Thaler*, 526 F.App'x 395, 2013 U.S. App. LEXIS 10182, 2013 WL 2158651 (5th Cir., May 21, 2013); *Sharp v. Puckett*, 930 F.2d 450, 453 (5th Cir. 1991), *citing Strickland*, 466 U.S. at 694. In a counseled appeal after conviction, the key is whether the failure to raise an issue worked to the prejudice of the defendant. *Sharp*, 930 F.2d at 453. This standard has been affirmed by the Supreme Court. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (holding that the petitioner must first show that his appellate attorney was objectively unreasonable in failing to find arguable issues to appeal, and also a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief raising these issues, he would have prevailed on his appeal). *See also Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001); *Schaetzle v. Cockrell*, 343 F.3d 440, 448 (5th Cir. 2003).

36

It should be noted that on appeal, effective assistance of counsel does not mean counsel who will raise every non-frivolous ground of appeal available, but rather counsel performing in a reasonably effective manner. *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998), *citing Evitts v. Lucey*, 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (appellate counsel "need not advance every argument, regardless of merit, urged by the appellant.")

Haden's appellate attorney, Robert Cole, gave an affidavit in the state habeas proceedings. He stated that he identified four appellate issues that he considered to have merit. While he did consider the issue of the probative value of the extraneous acts evidence being outweighed by the danger of unfair prejudice, he was of the opinion that this argument was so weak as to have no merit and its inclusion would negatively distract the Court of Appeals in considering the arguments he believed to be meritorious. (Docket no. 9-29, p. 195). The state habeas court found Cole's affidavit credible and supported by the record. (Docket no. 9-29, p. 205).

As discussed above, Texas Code of Criminal Procedure Article 38.37 renders evidence of extraneous offenses more often admissible in cases involving sexual assaults of children, notwithstanding the normal rules of evidence, and the admission of such evidence does not violate due process if the State makes a strong showing that the defendant committed the offense and the extraneous offense is rationally connected with the offense charged. A trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse of discretion standard. *Price v. State*, 594 S.W.3d 674, 679 (Tex.App.-Texarkana 2019, no pet.). A trial court does not abuse its discretion if the decision to admit the evidence is within the "zone of reasonable disagreement," and there is no abuse of discretion if the decision is supported by the record. *Id.*, *citing Bradshaw v. State*, 466 S.W.3d 875, 878 (Tex.App.-Texarkana 2015, pet. ref'd).

Haden offers nothing to suggest that the appellate court would likely have found admission of the extraneous offenses in this case to have been an abuse of discretion. As stated above, the evidence concerning the solicitation of a minor charge involved Haden seeking out a minor male and offering to perform essentially the same sexual acts upon him which Haden was charged with

37

committing against the victim in this case. William likewise testified that Haden performed essentially the same acts on him as he had upon the victim in this case. (Docket no. 9-9, pp. 30-31). *See Bradshaw*, 466 S.W.3d at 879; *Robisheaux*, 483 S.W.3d at 218. In the absence of any showing of likelihood that admission of the extraneous offenses would have been considered an abuse of discretion on appeal, Haden's claim on this point is without merit.

### F. An Evidentiary Hearing

Haden asserts that "at the very least," his claims necessitate an evidentiary hearing. He argues that his case is "strikingly similar" to *Richards v. Quarterman*, 578 F.Supp.2d 849 (N.D.Tex. 2008), *aff'd* 566 F.3d 553 (5th Cir. 2009). Haden states that his state habeas petition was denied without an evidentiary hearing and says that as in *Richards*, the state trial court purported to have a hearing on his state habeas application and purported to make findings, but did neither in a meaningful way. Consequently, the federal district court in *Richards* conducted its own evidentiary hearing and ultimately found that the petitioner's trial counsel had rendered constitutionally ineffective assistance.

Haden acknowledges that the AEDPA contains a specific provision limiting the granting of an evidentiary hearing, but this limitation applies only if the applicant failed to develop the factual basis of the claim. *See* 28 U.S.C. §2254(e)(2) (if the applicant has failed to develop the factual basis of a claim in state court proceedings, the federal court shall not hold an evidentiary hearing unless the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, or a factual predicate which could not previously have been discovered through the exercise of due diligence, and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense). He cites the district court in *Richards* as stating that the petitioner cannot be said to have failed to develop the factual basis of his claim unless the undeveloped record is the result of his own decision or omission.

Haden states that he sought an evidentiary hearing in state court, but received "only the pretense of one." He sought discovery of John's psychiatric records and the emails between the prosecutor and Jeremy Johnson, but the trial court never even ruled on his motions. Haden argues that the "hearing" limited to affidavits effectively excluded him from the fat-finding process, citing *Richards*, 578 F.Supp.2d at 853.

Furthermore, Haden asserts that the state court's findings and conclusions were "conclusory and not supported by the record." The findings concerning his claims of ineffective assistance simply concluded that trial counsel and his affidavit were "credible," but did not address the underlying claims. The affidavit from trial counsel contained conclusory and often incomplete responses to some allegations of ineffectiveness, and failed even to address other such allegations. Haden asserts that "a federal evidentiary hearing is required unless the state court trier of fact has after a full hearing reliably found the relevant facts." Because his state habeas application should not have been resolved based upon deficient affidavits, and the state habeas court did not reliably find the relevant facts after a full hearing, Haden argues that his claims necessitate an evidentiary hearing.

The mere fact that a state habeas court conducts a hearing via affidavit rather than a live evidentiary hearing does not itself make the state court findings insufficient. *Hudson v. Quarterman*, 273 F.App'x 331, 2008 U.S. App. LEXIS 7922, 2008 WL 1708998 (5th Cir., April 9, 2008), *citing Carter v. Johnson*, 131 F.3d 452, 460 n.13 (5th Cir. 1997). In addition, the Fifth Circuit has held that a full and fair hearing in state court is not a precondition to according the presumption of correctness to state habeas findings of fact or legal determinations. *Valdez v. Cockrell*, 274 F.3d 941, 951 (5th Cir. 2001); *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010).

Although Haden argues that he was unable to develop the factual basis of his claim in the state court proceeding, the Fifth Circuit has observed that even if a claim is not precluded by §2254(e)(2), this does not mean that the petitioner is necessarily entitled to an evidentiary hearing, only that he may be. A habeas petitioner is not entitled to an evidentiary hearing in federal court

unless the state did not provide him with a full and fair hearing and, if proven true, his factual allegations would entitle him to relief. *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000). The district court does not abuse its discretion in denying an evidentiary hearing if it has sufficient facts to make an informed decision regarding the merits of the claim. *Id.* If the record refutes the applicant's factual allegations or otherwise precludes habeas relief, the district court is not required to hold an evidentiary hearing. *Schriro v. Landrigan*, 550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007); *Clark v. Johnson*, 202 F.3d 760, 767 (5th Cir. 2000) (no hearing is required if the applicant has failed to present clear and convincing evidence to rebut the state court's factual findings).

Haden has not presented clear and convincing evidence to rebut the state court's factual findings, nor has he raised factual allegations which, if proven, would entitle him to relief. While he relies on *Richards*, the Fifth Circuit observed in that case that "Richards' petition alleged serious failures by Davis [trial counsel] which are not refuted by the record, and Davis' explanations of her trial conduct, as adopted by the state habeas court, are conclusory and in varying degrees of tension with the trial record." Significantly, the district court held and the Fifth Circuit affirmed that "any presumption of correctness of determinations made by the state court relevant to Richards' ineffective assistance of counsel ground have been rebutted by clear and convincing evidence." *Richards*, 578 F.Supp.2d at 854; 566 F.3d at 563. No such finding is appropriate in the present case. Haden has not demonstrated entitlement to an evidentiary hearing. His claims for habeas corpus relief are without merit.

### Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. §2253(c)(1)(A). A district court may deny a certificate of appealability *sua sponte* because the district court that denies a petitioner relief is in the best position to determine whether the petitioner

has made a substantial showing of a denial of a constitutional right on the issues before that court. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

The prerequisite for a certificate of appealability is a substantial showing that the petitioner has been denied a federal right. *Newby v. Johnson*, 81 F.3d 567, 569 (5th Cir. 1996). A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

Haden has not shown, nor does the record indicate, that jurists of reason could disagree with the district court's resolution of his claims or that the issues presented are adequate to deserve encouragement to proceed further.  Consequently, he is not entitled to a certificate of appealability.

## RECOMMENDATION

It is accordingly recommended that the above-styled application for the writ of habeas corpus be dismissed with prejudice as barred by the statute of limitations. 28 U.S.C. §2244(d).  It is further recommended that a certificate of appealability be denied *sua sponte*.

A copy of these findings, conclusions and recommendations shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions, and recommendations must file specific written objections within 14 days after being served with a copy.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's proposed findings, conclusions, and recommendation where the disputed determination is found.

An objection which merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific, and the district court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1987).

    Failure to file specific written objections will bar the objecting party from appealing the factual findings and legal conclusions of the Magistrate Judge which are accepted and adopted by the district court except upon grounds of plain error.  *Duarte v. City of Lewisville*, 858 F.3d 348, 352 (5th Cir. 2017).

      So ORDERED and SIGNED this 21st day of April, 2022.


K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE